IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DENISE COLEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 3824 |
| v. ) | |
| ) | |
| JOHN E. POTTER, ) | HONORABLE DAVID H. COAR |
| Postmaster General ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plainiff Denise Coleman sued her employer, the U.S. Postal Service, alleging that it put her on off-duty status and then terminated her based on her race, gender, and disability, and in retaliation for reporting discrimination. *See* 42 U.S.C. § 2000e-2(a); 29 U.S.C. § 794. She further alleges that the Postal Service failed to accommodate her disability. *See* 29 U.S.C. § 794. The Postal Service has moved for summary judgment on her claims. For the reasons that follow, the Postal Service's motion is GRANTED.

### BACKGROUND

Coleman is an African-American woman who began working for the Postal Service in 1974. (Defendant's Rule 56.1 Statement of Material Facts ("DSOF") ¶ 1, 3.) She is a full-time mail clerk at the Chicago Bulk Mail Center and reports to the manager of maintenance operations. (Id. ¶ 2, 4.) That position was held by Jerome Jefferson, a black male, from 1992 until his retirement in January 2005. (Id. ¶ 4.) While under Jefferson's supervision Coleman received awards for her performance, most recently in 2002. (Plaintiff's Rule 56.1 Statement of Material Facts ("PSOF") ¶ 30; PSOF Tab 4, Jefferson Dep., Ex. 2.)

When Jefferson retired, a higher-level manager, William Sove, chose Willie Berry, also a black male, to replace Jefferson. (DSOF ¶ 8.) Coleman thought she should have been promoted into the manager position when Jefferson left. (DSOF ¶ 10.) It is unclear whether she was even eligible to apply, but the dispute is immaterial. In April 2005, a few months after Sove selected Berry for the manager position, Coleman emailed the plant manager, Gregory Johnson, complaining about how Berry treated her and asserting that she should have been given the promotion. (PSOF ¶ 21; PSOF Tab 5, Sove Dep., Exh.3.) Even read in the light most favorable to Coleman, however, the letter does not seem to allege that discrimination was the root of those complaints. (PSOF Tab 5, Sove Dep., Exh.3.) A month later, in May 2005, she also emailed Sove, complaining that Berry had changed the rules when he started as manager. (PSOF ¶ 22; PSOF Tab 5, Sove Dep., Exh. 5.) Any references to discrimination were oblique except that she threatened to file an "EEO" case. (PSOF Tab 5, Sove Dep., Exh. 5.)

In June 2005, Coleman requested that she be "advanced" 120 days of sick leave—that is, she asked permission to take more sick leave than she had available at that time. (DSOF ¶ 11.) Johnson denied the request explaining that Coleman had used her sick leave heavily and that she would be unable to earn that amount of sick leave before her planned retirement in three years. (Id. ¶ 12-13, 15-16.) Coleman denies telling Johnson that she was planning to retire. (PSOF Tab 2, Coleman Dep., p. 62 ln. 23-25, p.63 ln. 1-5.) Johnson was the final decisionmaker regarding such requests, though Coleman testified that Johnson told her that he would consult Sove. (DSOF ¶ 12, PSOF Tab 2, Coleman Dep., p. 61 ln. 16-20.)

On June 23, 2005, Coleman returned to work from the medical procedure and she provided Berry with her temporary medical restrictions, which greatly limited climbing stairs. (DSOF ¶ 19-20.) Her usual work station was up a flight of stairs, but Berry told her that she

could work in the store room on the first floor. (Id. ¶ 21.) Coleman said she could not work in the store room because she had asthma; she testified that the chemicals in that room had caused her to have a severe asthma attack in 1988. (PSOF Response to DSOF ¶ 21; PSOF Coleman Dep. p. 34, ln. 24-25, p. 35, ln. 1-4; id. p. 71, ln. 10-17.) For reasons that Coleman and Berry dispute, Coleman did not work that day. (DSOF ¶ 22, PSOF Response to DSOF ¶ 22.) She returned a week later with revised medical restrictions that would allow her to climb one to two flights of stairs once or twice per day. (DSOF ¶ 23.) That would have allowed her to get to and from her work station. But though she used to clock in and out on the same floor as her work station, Berry now told her that all employees had to use a time clock that was one floor down. (PSOF Response to DSOF ¶ 24; PSOF Tab 2, Coleman Dep. p. 35, ln. 10-19.) This change would require more stairs than she could handle in a day, so Berry again told her she could work in the store room. (PSOF Tab 2, Coleman Dep. p. 35, ln. 20-22.) Coleman did not work that day either. (DSOF ¶ 25; PSOF Response to DSOF ¶ 25.) In the midst of this, in June and July, Coleman filed two EEO requests for pre-complaint counseling, asserting that Berry and Sove were discriminating against her. (PSOF ¶ 23.) On July 6, 2005 Berry issued Coleman a notice that she was considered absent without leave because she had not called in or worked in five days. (DSOF ¶ 26.)

Within a few days of receiving the AWOL notice Coleman sought psychiatric treatment at Northwestern Hospital. (DSOF ¶ 29.) She was admitted on July 12, 2005 for depression. (Id. ¶ 30; PSOF Tab 2, Coleman Dep., p. 75 ln. 20-25.) While in treatment Coleman expressed anger with Berry that the psychiatrist interpreted as a threat against Berry's life. (PSOF Tab 2, Coleman Dep., p. 76 ln. 10-24, p. 77 ln. 1-14.) The doctor discharged Coleman from the hospital on August 3 in stable condition, but before doing so the doctor informed Berry that it was her

legal responsibility to tell him that Coleman had made a threat against Berry's life. (DSOF ¶ 33; PSOF Response to DSOF ¶ 33; DSOF Tab D, Berry Dep., p. 221 ln. 6-13.)

The same day that Berry learned of the threat, he notified Sove and another upper-level manager, Charles Von Rhein, and placed Coleman in "emergency off-duty status" without pay. (DSOF ¶ 34-35; PSOF ¶ 1.) Two weeks later, Berry filed a police report. (PSOF ¶ 17.) The Postal Service also launched an investigation of the incident, in which Von Rhein and Sove participated, but the investigation apparently was not complete for months. (DSOF ¶ 37-38.) Also in mid-August, Coleman filed an EEOC charge against Berry, Sove, and Von Rhein concerning the denial of advanced sick leave, Berry's alleged refusal to accommodate her medical restrictions in June, and a few earlier incidents when she was charged with absence without leave and when Berry refused a schedule change request. (DSOF ¶ 17; PSOF Response to DSOF ¶ 17; DSOF Tab I, p. 1.)

In December, Coleman's doctor wrote a letter to Sove stating that Coleman could return to work if she was not under Berry's supervision. (PSOF Tab 8, Coleman Decl., Att. 5.) Around the same time, Coleman filed a second EEOC charge against Berry, Sove, and Von Rhein, alleging that by putting her on off-duty status they were retaliating against her and discriminating against her on the basis of gender, race, and disability. (Dkt. 17, 1st Am. Compl., Exh. B.)

In the meantime, although Coleman was not working for the Postal Service, she continued working part-time for H&R Block during 2005, 2006, and 2007. (DSOF ¶ 49.)

In January 2006, Sove and Von Rhein terminated Coleman's employment. (DSOF ¶ 38.) The notice of removal stated that Coleman was being terminated based on a charge of "unacceptable conduct, as evidenced by your expressed homicidal ideations toward a postal manager." (PSOF Tab 7, Von Rhein Dep., Exh. 9, p. 1.) The notice further stated that Coleman

legal responsibility to tell him that Coleman had made a threat against Berry's life. (DSOF ¶ 33; PSOF Response to DSOF ¶ 33; DSOF Tab D, Berry Dep., p. 221 ln. 6-13.)

The same day that Berry learned of the threat, he notified Sove and another upper-level manager, Charles Von Rhein, and placed Coleman in "emergency off-duty status" without pay. (DSOF ¶ 34-35; PSOF ¶ 1.) Two weeks later, Berry filed a police report. (PSOF ¶ 17.) The Postal Service also launched an investigation of the incident, in which Von Rhein and Sove participated, but the investigation apparently was not complete for months. (DSOF ¶ 37-38.) Also in mid-August, Coleman filed an EEOC charge against Berry, Sove, and Von Rhein concerning the denial of advanced sick leave, Berry's alleged refusal to accommodate her medical restrictions in June, and a few earlier incidents when she was charged with absence without leave and when Berry refused a schedule change request. (DSOF ¶ 17; PSOF Response to DSOF ¶ 17; DSOF Tab I, p. 1.)

In December, Coleman's doctor wrote a letter to Sove stating that Coleman could return to work if she was not under Berry's supervision. (PSOF Tab 8, Coleman Decl., Att. 5.) Around the same time, Coleman filed a second EEOC charge against Berry, Sove, and Von Rhein, alleging that by putting her on off-duty status they were retaliating against her and discriminating against her on the basis of gender, race, and disability. (Dkt. 17, 1st Am. Compl., Exh. B.)

In the meantime, although Coleman was not working for the Postal Service, she continued working part-time for H&R Block during 2005, 2006, and 2007. (DSOF ¶ 49.)

In January 2006, Sove and Von Rhein terminated Coleman's employment. (DSOF ¶ 38.) The notice of removal stated that Coleman was being terminated based on a charge of "unacceptable conduct, as evidenced by your expressed homicidal ideations toward a postal manager." (PSOF Tab 7, Von Rhein Dep., Exh. 9, p. 1.) The notice further stated that Coleman

legal responsibility to tell him that Coleman had made a threat against Berry's life. (DSOF ¶ 33; PSOF Response to DSOF ¶ 33; DSOF Tab D, Berry Dep., p. 221 ln. 6-13.)

The same day that Berry learned of the threat, he notified Sove and another upper-level manager, Charles Von Rhein, and placed Coleman in "emergency off-duty status" without pay. (DSOF ¶ 34-35; PSOF ¶ 1.) Two weeks later, Berry filed a police report. (PSOF ¶ 17.) The Postal Service also launched an investigation of the incident, in which Von Rhein and Sove participated, but the investigation apparently was not complete for months. (DSOF ¶ 37-38.) Also in mid-August, Coleman filed an EEOC charge against Berry, Sove, and Von Rhein concerning the denial of advanced sick leave, Berry's alleged refusal to accommodate her medical restrictions in June, and a few earlier incidents when she was charged with absence without leave and when Berry refused a schedule change request. (DSOF ¶ 17; PSOF Response to DSOF ¶ 17; DSOF Tab I, p. 1.)

In December, Coleman's doctor wrote a letter to Sove stating that Coleman could return to work if she was not under Berry's supervision. (PSOF Tab 8, Coleman Decl., Att. 5.) Around the same time, Coleman filed a second EEOC charge against Berry, Sove, and Von Rhein, alleging that by putting her on off-duty status they were retaliating against her and discriminating against her on the basis of gender, race, and disability. (Dkt. 17, 1st Am. Compl., Exh. B.)

In the meantime, although Coleman was not working for the Postal Service, she continued working part-time for H&R Block during 2005, 2006, and 2007. (DSOF ¶ 49.)

In January 2006, Sove and Von Rhein terminated Coleman's employment. (DSOF ¶ 38.) The notice of removal stated that Coleman was being terminated based on a charge of "unacceptable conduct, as evidenced by your expressed homicidal ideations toward a postal manager." (PSOF Tab 7, Von Rhein Dep., Exh. 9, p. 1.) The notice further stated that Coleman

had violated Section 665.24 of the USPS Employee & Labor Relations Manual, which prohibits threats of violence.[1] (Id. p.4; PSOF PSOF ¶ 2.)

Coleman filed a grievance with the Postal Workers Union concerning her termination. (DSOF ¶ 39.) The union arbitrator characterized the issue before him as follows: "Did the Postal Service have just cause to issue Grievant a Notice of Removal?" (DSOF Ex. H.) The arbitrator determined that Coleman's statements to her psychiatrist did not amount to a "true threat" and thus did not violate the Postal Service's regulations. (Id.) The arbitrator based this determination in part on his conclusion that Berry was not truly afraid that Coleman would carry out the threat. (Id.) The arbitrator further determined that under the circumstances, the Postal Service did not have just cause to terminate Coleman but should have instead referred her for a fitness-for-duty examination. (Id.) The arbitrator reinstated Coleman, subject to a fitness-for-duty examination because her treatment "raise[d] serious concerns about her fitness for duty, and under what conditions she might be able to work." (Id. p. 15-16.) After the arbitrator's decision issued in March 2007, Coleman completed the fitness-for-duty examination, and after further psychiatric treatment, she was allowed to return to work September 1, 2007. (PSOF ¶ 35.) Per the arbitration award she reported to a different supervisor, Shirley Evans. (Id.)

Coleman brought this lawsuit alleging that when the Postal Service put her on off-duty status and then terminated her, it discriminated against her on the basis of race, gender, and disability; retaliated against her for reporting such discrimination; and failed to accommodate a

---

[1] The notice quotes Section 664.24 as follows: "The Postal Service is committed to the principle that all employees have a basic right to safe and humane working environment. In order to ensure this right, it is the unequivocal policy of the Postal Service that there must be no tolerance of violence or threats of violence by anyone at any level of the Postal Service. Similarly, there must be no tolerance of harassment, intimidation, threats, or bullying by anyone at any level. Violation of this policy may result in disciplinary action, including removal from the Postal Service."

disability. She does not challenge the earlier instances of alleged discrimination, such as the incident regarding the store room, except as background for her claims regarding her termination. To support her claims of discrimination, she has identified four employees who she asserts are similarly situated to her but are not members of the relevant protected classes.

The first two comparators are Robert Pelletier and Frank Arient, both white men. (PSOF ¶ 3.) Pelletier and Arient were both maintenance mechanics for the Postal Service. (PSOF ¶ 3.) They reported to supervisor Brian Turkovich, though both Turkovich and Berry reported to Von Rhein. (Def. Reply to PSOF ¶ 3; PSOF Tab 7, Von Rhein Dep., p. 159, 170.) Pelletier and Arient pulled a pocket knife on another employee, who was black. (PSOF Tab 7, Von Rhein Dep., p. 156, 157-58, 169-71.) When Turkovich learned of the incident three days later, he conducted an investigation. (Id. p. 159, 164.) Von Rhein also participated in the investigation, but he testified that his role was essentially signing off on what Turkovich decided. (Id. 160, 169-72.) Turkovich concluded the incident was just "horseplay," and recommended a 14-day suspension, which Von Rhein approved. (Id. 169-73.) After the union got involved, Turkovich reduced the suspension to 7 days, again with Von Rhein's approval. (Id. 173.)

The next comparator is Donald Savage, a black man who works as a maintenance support clerk. (PSOF ¶ 10.) Savage's direct supervisor was Evans, though his manager was Berry. (PSOF ¶ 10; PSOF Tab 3, Hoover Dep., p. 62.) Another clerk, Denice Hoover, testified that Savage threw a large desk telephone at a wall, causing a nearby employee to jump out of the way to avoid rebounding debris. (PSOF ¶11; PSOF Tab 3, Hoover Dep., p. 59-62.) Savage was not disciplined for this incident. (PSOF ¶ 12.) There is no evidence that the incident was ever reported to management or that Berry knew about it. (Def. Resp. to PSOF ¶ 12; Berry Dep., p. 166-67.)

The last comparator is James Kalivoda. He is a white male who worked as a mail clerk and reported to Berry. (PSOF ¶ 8.) Kalivoda told a co-worker that he was thinking about committing suicide. (PSOF ¶ 9.) Berry learned of the incident and did not discipline Kalivoda. (PSOF ¶ 9; Def. Resp. to PSOF ¶ 9.)

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "'only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007)). In determining whether there is an issue of material fact, the court views the evidence in the light most favorable to Coleman and draws reasonable inferences in her favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).

**ANALYSIS**

*Title VII Claims*

To establish a prima facie case of discrimination under Title VII using the indirect method, Coleman must show that "(1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably." *Greene v. Potter*, 557 F.3d 765, 768 (7th Cir. 2009). If she clears this hurdle, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse action. *Id.* If the employer does so, Coleman must show that the stated reason is merely a pretext for the kind of discrimination the statute proscribes. *Id.* Pretext is "'more than just faulty reasoning or

mistaken judgment on the part of the employer,'" it is a "'lie, specifically a phony reason.'" *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838-38 (7th Cir. 2009) (quoting *Argyropoulos*, 539 F.3d at 736). If the employer (that is, the decisionmaker) honestly believes the reason, it is not pretextual. *Id.*; *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010).

There is no dispute that Coleman is a member of two protected classes; she is female and she is African-American. Coleman points out that she received awards for her performance at work (most recently in 2002), and thus asserts that she was meeting legitimate performance expectations. The Postal Service does not challenge Coleman's performance at work.[2]

The Postal Service argues that although Coleman's employment was terminated, she did not suffer an adverse employment action because she was ultimately reinstated—eighteen months later. As Coleman points out, this argument is contrary to Seventh Circuit precedent. Even an employee who was reinstated four months after being terminated, and given back pay, has suffered an adverse employment action. *Phelan v. Cook County*, 463 F.3d 773, 780-81 (7th Cir. 2006). Coleman, who was reinstated (without back pay) over eighteen months after being terminated and twenty-five months after being placed on off-duty—upaid—status, suffered an adverse employment action.

The Postal Service next argues that Coleman has not shown that any similarly situated employees were treated more favorably (or rather, punished less harshly). Coleman's best comparators are two white men, Robert Pelletier and Frank Arient, who were given a suspension after they pulled a knife on a black employee. However, the two men held a substantially

---

[2] It is somewhat surprising that the Postal Service does not dispute this prong. There is evidence in the record that Berry and Sove thought much less highly of Coleman's performance. Sove, after looking into Coleman's complaints about being denied sick leave, told her in an email that her attendance was "unacceptable and in need of corrective action." (Sove Dep., Pl. Stmt. of Fact, Tab 5, Exh. 5 p.2.) He further noted that Coleman had used 98% of her sick leave during her 30 years of service. (Id.) Berry testified that instead of working Coleman would set up two chairs to make herself a bed and sleep. (Berry Dep., Def. Stmt. of Fact, Tab D, p. 110 ln. 5-16.)

different job than Coleman; they were maintenance mechanics, not mail processing clerks. Coleman has not produced any evidence of similar job duties aside from classifying the men as "laborers." Pelletier and Arient reported to a different supervisor, Brian Turkovich. And though Turkovich reported to Von Rhein, Von Rhein's role in this incident was signing off on Turkovich's decision. Though there is at least some similarity in terms of the seriousness of the incident here, it is not enough because in all other material respects Coleman is not similarly situated to Pelletier and Arient. *See, e.g.*, *Burkes v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

The other two comparators are even less helpful. The second, Donald Savage, was never disciplined for throwing a telephone, but that is not surprising because there is no evidence that that the incident was ever reported to his supervisors. The last, James Kalivoda, was not disciplined after he told a co-worker that he was thinking about committing suicide. That situation is simply not comparable to a threat to hurt another person.

Even if Coleman had established a prima facie case, however, her claim would falter at the pretext stage. The Postal Service has offered a non-discriminatory reason for terminating Coleman—it said Coleman violated its code of conduct by threatening her supervisor. Coleman protests that the Postal Service is collaterally estopped from putting forth the alleged threat as a legitimate reason for her discharge. She argues that the arbitrator's determination that she was fired without just cause conclusively establishes that the alleged threat was not a legitimate reason for firing her. The Postal Service responds by citing cases for the unremarkable proposition that a district court reviews de novo an agency's findings on a discrimination claim; it does not attempt to explain why the rule that governs review of an agency's findings in the same case also applies to review of an arbitrator's ruling in a union grievance.

Collateral estoppel applies only if, among other things, the issue in both proceedings is identical. *Goodwin v. Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 621 (7th Cir. 2006). The arbitrator was tasked with determining whether "the Postal Service ha[d] just cause to issue [Coleman] a Notice of Removal," and concluded that it did not. Whether the Postal Service had "just cause" to terminate Coleman is not the same issue as whether the Postal Service discriminated against Coleman. The arbitrator's conclusion also does not establish that the Postal Service's proffered reason was not "legitimate" in the sense of the Title VII case law. The defendant's burden at this stage is only to offer a lawful reason for discharging the plaintiff, and a violation of postal regulations involving a threat to another employee would be a lawful reason. Even if the reason proves unsound, it is not pretextual if the employer—that is, the decisionmaker—actually relied on it. And the arbitrator's decision does not disprove that either. It may be that the Postal Service exercised poor judgment in concluding that Coleman's statements warranted termination, but without more a lapse in judgment does not prove that unlawful discrimination was at play. The arbitrator's conclusion does not establish that the proffered reason is a "lie, specifically a phony reason." *Scruggs*, 587 F.3d at 838-38. And Coleman has not presented any other evidence of pretext.

*Rehabilitation Act Claims*

Coleman also asserts that the Postal Service discriminated against her because she was disabled and that it failed to accommodate her disability, both in violation of the Rehabilitation Act. The Rehabilitation Act is the equivalent of the Americans with Disabilities Act (ADA) but for employees of federally funded programs, and uses the same standards. *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008). To establish either a discrimination or failure to accommodate claim under the Rehabilitation Act, Coleman must first establish that she is

- 10 -

disabled within the meaning of the statute. 42 U.S.C. § 12102(2); *Gratzl v. Office of Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 678 & n.2 (7th Cir. 2010); *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). An employee is disabled if she has "physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment" by her employer." 42 U.S.C. § 12102(2); *Garg*, 521 F.3d at 736. An impairment that "substantially limits" the major life activity of working is one that precludes that employee from working a broad range of jobs. *Duncan v. State of Wis. Dep't of Health and Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999). An impairment that precludes an employee not from performing her job, but only from working for a particular supervisor, is not a disability within the meaning of the statute. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) ("[Plaintiff] claims she can do her job, but not while being supervised by Terry Skorupka. If [Plaintiff] can do the same job for another supervisor, she can do the job, and does not qualify under the ADA.")

Coleman has not proven that she is disabled. By her own admission, the "accommodation" she needed to do her job was to be assigned a supervisor other than Berry. If she was able to do the same job for another supervisor, she is not disabled within the meaning of the statute. Indeed, as of her reinstatement in 2007, Coleman has performed the same job for another supervisor. In addition, during the period in 2005 through 2007 that she was not employed by the Postal Service, she maintained a different job, with H&R Block. All of this belies the suggestion that Coleman is unable to work in a broad variety of jobs.

To the extent Coleman asserts that the Postal Service regarded her as disabled as of the date she was put on off-duty status, she has not proven that either. There is no evidence that anyone at the Postal Service thought her unable to work a broad range of jobs; at best Coleman

suggests that the Postal Service regarded her as unable to perform her specific job, with Berry as her supervisor.

*Retaliation Claims*

The analysis of Coleman's Title VII and Rehabilitation Act discrimination claims prevents her from succeeding on her retaliation claims as well. A prima facie case of retaliation under both Title VII and the Rehabilitation Act requires a showing that other similarly situated employees who did not engage in protected activity were treated more favorably. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). Coleman has not shown that the comparators described above are similarly situated to her, as discussed above. Additionally, Coleman has not shown whether any of the comparators engaged in protected activity or had a disability. Finally, assuming that Coleman had established a prima facie case, the Postal Service has offered a non-discriminatory reason for its actions, so the same pretext analysis as above applies to both of those claims.

Although Coleman also seems to argue that she can establish retaliation through the direct method, she has not done so. The direct method usually requires an admission of discriminatory animus, which Coleman lacks, or at least circumstantial evidence of such animus. *Nagle v. Vill. of Calumet Pk.*, 554 F.3d 1106, 1114 (7th Cir. 2009). Relevant circumstantial evidence would include suspicious timing or evidence that similarly situated employees outside the protected class were systematically treated more favorably. *Id.*; *Hemsworth v. Quotesmith*, 476 F.3d 487, 491 (7th Cir. 2007). But as discussed above, Coleman has not established that similarly situated employees were treated more favorably. She also argues that the timing was suspicious, noting that she was placed on off-duty status after she began complaining of discrimination and fired after she filed the EEOC charges. But the timing is at best equivocal,

given that Coleman was put on off-duty status the very day her doctor told Berry that Coleman had homicidal ideation toward him. And in any event, "suspicious 'timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.'" *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cirl. 2010) (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)); *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432-33 (7th Cir. 2010).

## CONCLUSION

For the reasons stated above, the Defendant's motion for summary judgment is GRANTED.

Enter:
/s/ David H. Coar

_____

David H. Coar
United States District Judge

**Dated:** October 19, 2010